**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SAM KOLAITES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 15 C 9499** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Michael T. Mason** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of

the Commissioner of Social Security denying Plaintiff Sam Kolaites's claim for Disability

Insurance Benefits and Supplemental Security Income.  The parties have consented to

the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Kolaites has moved for summary judgment.  (Doc. No. 10.)  For the reasons that follow,

Kolaites's motion for summary judgment is GRANTED.

## BACKGROUND

### I.    PROCEDURAL HISTORY

Kolaites applied for benefits on May 17, 2012, alleging disability since February

14, 2011 due to a torn meniscus in his right knee, two knee surgeries, and a

temporomandibular joint ("TMJ") derangement and tear.  (R. 180, 232.)  Kolaites's claim

was denied initially and upon reconsideration, after which he timely requested a hearing

before an Administrative Law Judge ("ALJ").  (R. 122.)  At a hearing held on February

24, 2014, Kolaites personally appeared and testified before the ALJ.  (R. 32–55.)  On

August 20, 2014, the ALJ issued a decision denying Kolaites's claim for benefits. (R. 9–21.) When the Appeals Council denied his request for review, the ALJ's decision became the final decision of the Commissioner, reviewable by the district court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.  MEDICAL EVIDENCE

### A.  Treatment Records

Kolaites, who was 61 years old at the time of his ALJ hearing, had surgery on his right knee in 2007. (R. 426.) In October 2010, Kolaites was involved in a workplace accident at the Aldi store when a 30-pound carton of frozen food fell from an unstable pallet and struck him in the right side of his jaw. (R. 178; 370.) The blow injured his jaw and caused him to fall and twist his right knee, reinjuring it. (R. 178, 390.) The next day he saw Dr. John E. Christofersen at Dreyer Medical Clinic, the medical clinic preferred by his employer for workplace injuries. (R. 77, 390–91.) Kolaites reported that his knee pain was even greater than it had been prior to his 2007 surgery. (*Id.*) The doctor diagnosed a probable strain of the medial collateral ligament and a contusion (bruise) of the jaw, prescribed naproxen, and released him to work on modified duty. (R. 391.) At a follow up appointment on November 3, Kolaites indicated that his knee and jaw both continued to cause significant pain. (R. 398-99.) Dr. Christofersen prescribed prednisone and referred him to physical therapy. (R. 399.) He completed four sessions of physical therapy for his knee in November 2011. (R. 298–99, 393–97, 401–10.) At his next appointment with Dr. Christofersen on November 10, he reported that he had gradual improvement in his knee with physical therapy, but still experienced continued pain and grinding in his jaw. (R. 412.) He was referred to ear, nose, and throat doctor

Richard L. Kersch, who in turn referred him for an oral surgery evaluation. (R. 414, 633.)

An MRI taken of Kolaites's knee on December 8, 2010 resulted in a diagnosis of a knee sprain with small effusion and possible medial meniscal tear, but overall no significant change from a February 2007 examination. (R. 602–03.) An orthopedist who reviewed the MRI agreed with the radiologist and diagnosed a meniscal tear. At that point, Kolaites was given an expedited referral to one of the Dreyer Clinic's orthopedic surgeons to discuss surgical options. (R. 424.) At a consultation with orthopedic surgeon Dr. Neena Szuch on January 12, 2011, Kolaites elected to proceed with arthroscopy with partial medial meniscectomy, despite some increased risks posed by his history of previous surgery to the same knee. (R. 426–27.) Dr. Szuch performed arthroscopic surgery on February 14, 2011. (R. 429–30.)

Kolaites resumed physical therapy for his knee February 22, 2011 and attended 29 sessions between then and July 2011, with only one break from therapy pursuant to the advice of his jaw surgeon. (R. 431, 486, 563.) At a follow-up appointment on March 23, 2011, Dr. Szuch indicated that he could go back to work beginning April 4 provided that he not stand for more than four hours at a time and that he avoid bending, kneeling, twisting, or lifting greater than twenty pounds. (R. 681.) As discussed below, his intervening jaw surgery delayed his return to work until May 2, 2011. (R. 484, 486.)

In any event, despite his doctor's recommendations that he not stand for more than four hours at a time, Kolaites returned to full-time work of up to ten hours a day, which caused continued pain with his knee. (R. 486.) On May 18, 2011, Dr. Szuch noted that Kolaites was reporting pain, had a reduced range of motion, and walked with

a slight limp. (R. 487.) She again recommended that he work no more than four hours per day, with no bending, kneeling, twisting and no lifting greater than twenty pounds. (R. 487.) Kolaites reduced his hours to 20 per week, but was uncertain whether he would be able to return to full-time work when modified duty was no longer available. (R. 489, 497, 501–02, 513.) Kolaites reported to his doctor on June 8, 2011 that when he was working part-time he would get sore after about three hours of work. (R. 517.) Dr. Szuch advised that he continue with only part-time work if that was available to him. (*Id.*) His physical therapist also agreed that he could not tolerate his previous full-time work schedule. (R. 516.) On June 23, Kolaites reported to his physical therapist that he had sat for one and a half hours the day before, the longest he had remained sitting since the surgery, and was still feeling stiff a day later. (R. 536.) On July 5, the therapist noted that "overall" Kolaites did "not feel much better, pain level is down since he is not working but the same things still cause pain," such as sitting then trying to get up, bending the knee to put on pants, and using stairs. (R. 556.)

Notes dated July 6, 2011 from Dr. Szuch reflect that Kolaites's right knee was still sore and stiff with activity, generated throbbing pain after periods of standing, and felt best at rest. (R. 560.) Nonetheless, his doctor noted that he "wishe[d] to resume his regular work schedule in the near future." (*Id.*) He ended his course of physical therapy on July 7 with plans to return to regular work the following week. (R. 563.) On July 27, 2011, Dr. Szuch continued to recommend restriction to a four-hour workday because a full work schedule had caused his knee to swell. (R. 568.) She also referred him for a Functional Capacity Evaluation (FCE). (*Id.*) The FCE, which was performed on August 25, revealed that Kolaites was found capable of lifting up to 45 pounds occasionally and

35 pounds frequently, which left him unable to meet some of the lifting, carrying, kneeling, and crouching demands of his job as a manager at the Aldi grocery store where he worked. (R. 571-72.) The examiner stated that Kolaites gave full effort and that his reports of limitations and pain were consistent with his actual limitations and observed behaviors. (R. 572.) His heart rate and rapid-exchange grip test also demonstrated a full level of physical effort. (R. 575.) The examiner also observed that Kolaites "had increased pain and difficulty with daily activities after 2 hours of testing," and suggested than any return to full-time duties should be discussed with his physician. (R. 572.)

At an appointment with Dr. Szuch on August 31, 2011, Dr. Szuch released Kolaites to work with 45- and 35-pound lifting restrictions, with no right side kneeling and only short periods of crouching. (R. 583, 687.) She opined that he was unable to work if modified duty was not available. (R. 583, 687.) On September 30, 2011, Dr. Szuch further clarified those work restrictions, writing, "all physical work can only be done for up to 4-hour shifts per day. If he is given sedentary work, that could be performed without restriction in regard to work hours." (R. 585.)

Despite Dr. Szuch's recommended restrictions, Kolaites was sent to an independent medical examiner who opined that he required no restrictions. (R. 597.) Because he had used up the six weeks of modified duty available to him through his employer, he returned to full-duty work. (R. 55, 597.) On February 23, 2012, during his third day back at work full-time, Kolaites's right knee gave out while he was unloading a 40-pound item from a pallet. (R. 588, 591, 597.) A visit to the Dreyer Medical Clinic confirmed "obvious swelling" and some tenderness in the right knee, and Kolaites could

bear weight on that knee only with "significant discomfort." (R. 588–89.) An X-ray taken that same day revealed no change from the degeneration already visible on his October 2010 image. (R. 601.) He was prescribed naproxen and released to work with "sitting mainly," with "no prolonged standing or walking" and no climbing, bending, stooping, and kneeling, no floor-level lifting and no lifting in excess of ten pounds. (R. 589.) By March 1, 2012, his pain had not improved, but there was no obvious swelling. (R. 591–92.) His work restrictions were loosened to "alternate sitting/standing" with no climbing, bending, stooping, kneeling, or lifting more than twenty pounds. (R. 592.) On March 8, 2012, Kolaites was unable to fully flex his knee and could extend it straight only with pain. (R. 495.) He was referred back to orthopedist Dr. Szuch, who on March 14, 2012 attributed his re-injury to work activity that exceeded his tolerance. (R. 598.) In her treatment plan, she wrote, "we once again recommend the same formal restrictions that were put in place before," limiting "physical work" to "up to a four hour shift per day," otherwise "on restricted sedentary work." (R. 598.)

While addressing his knee pain through arthroscopic surgery and physical therapy, Kolaites also endured three surgeries and two courses of physical therapy for the ongoing pain in his jaw. Dr. Herbert D. Stith, an oral and maxillofacial surgeon, examined Kolaites's jaw on December 1, 2010 and noticed an audible grinding in the right TMJ, together with popping and clicking. (R. 370.) He referred Kolaites to physical therapy for the jaw, but after four visits Kolaites stopped because of lack of improvement. (R. 370, 729.) In December 2010, an MRI provided strong evidence for a central perforation or tear in the anterior and posterior aspects of the meniscus, which were separated. (R. 371, 618.) Dr. Stith recommended arthroscopy, but explained that

further surgery might still be required in the future to repair or remove the disc.  (R. 371.)  On February 1, 2011, Dr. Stith again examined Kolaites and found that he could not move his jaw to the right or open it more than 25 millimeters.  (R. 372.)  Kolaites agreed to arthroscopic surgery, which Dr. Stith performed on February 3, 2011.  (R. 372–374.)  However, treatment notes from Dr. Stith dated April 12, 2011 acknowledge that, even after arthroscopy and additional physical therapy, Kolaites's jaw pain persisted, especially with eating.  (R. 376.)  In May 2011, his dentist reported that the trauma to his jaw and subsequent surgeries had changed Kolaites's bite so as to loosen one crown and damage other dental work.  (R. 721.)

After discussing his options with the oral surgeon, Kolaites elected to have a second surgery, an open-joint disc plication, which was performed by Dr. Stith on June 25, 2011.  (379–381.)  A September 2012 MRI of his TMJ displayed numerous degenerative changes to the right TMJ.  (R. 653.)  After he achieved no pain relief from the second jaw surgery, Kolaites again met with Dr. Stith on January 14, 2013 to discuss his remaining option: total removal of the TMJ disc and reconstruction of the jaw using a partial prosthetic joint.  (R. 655, 657.)  Because of his continued pain and difficulty eating, Kolaites wished to go through with the surgery, which was performed by Dr. Stith on January 23, 2013 and required an overnight hospital stay.  (R. 657–660, 697–709.)  This surgery necessitated further corrective dental work later in 2013.  (R. 722.)  Kolaites also attended additional physical therapy for his jaw.  (R. 730.)  After sixteen post-surgical sessions of physical therapy for his jaw, his physical therapist reported on June 4, 2013 that his jaw opening had actually decreased, and he had

difficulty with chewing. She concluded that Kolaites was "not making much progress" despite the treatments. (R. 730.)

**B.    Consultants' Reports**

Dr. Greg Papiez, a consultative examiner, reviewed portions of Kolaites's file and examined him on October 6, 2012. (R. 638.) Dr. Papiez found that Kolaites had right knee pain with moderately reduced flexion and jaw pain with a painful range of motion. (R. 642.) Kolaites also demonstrated moderate difficulty walking on his toes, heel-toe walking, and standing on his right leg, and severe difficulty hopping on his right leg. (R. 640–42.)

At Kolaites's hearing on February 24, 2014, the ALJ heard oral testimony from Dr. James McKenna, an internist and pulmonologist who had reviewed Kolaites's file and heard his testimony. (R. 47, 57–72.) Dr. McKenna testified that the blow to Kolaites's jaw by a 30-pound object represented a "modest weight" more equivalent to a punch to the jaw than to a serious industrial accident. (R. 58–59.) He described Kolaites's jaw MRI as containing "strong evidence for a central perforation tear." (R. 59, describing R. 354.) Dr. McKenna described Kolaites's history of jaw surgeries and pointed to "intractable jaw pain" as the reason for his third jaw surgery, in January 2013. (R. 60-62.)

As to Kolaites's right knee, Dr. McKenna described MRI evidence of a "disrupted meniscus—quite a torn meniscus with various shreds" which surgeons ground down and smoothed through arthroscopy. (R. 62, describing R. 420–21.) Still, he indicated that "people can get by without" a meniscus, which provides "a little extra padding" but does not bear weight. (R. 65.) He also described some "very small" areas of "full

thickness cartilage loss" in the patella and femur that were "planed off, debrided off, rounded off" during the surgery. (R. 63.) He testified that he found no physical evidence that would explain Mr. Kolaites's level of subjective complaints. (R. 65.) Dr. McKenna stated that, based on Mr. Kolaites's own subjective reports, including to his doctors, he would be limited to a sedentary RFC. (R. 70.) However, based on his own assessment of the objective medical evidence, Dr. McKenna saw nothing that would limit Kolaites from performing jobs up to the medium exertion level. (R. 71.)

C.     Kolaites's Testimony

In written testimony dated June 12, 2012, Kolaites related that his last work attempt ended when, after three hours of work, his knee gave out and he fell to the floor. (R. 251.) Describing his current level of impairment, Kolaites explained that he had pain in his knee during any kind of motion. (R. 251.) His knee also hurt and locked up if he sat for too long, limiting him to thirty minutes of sitting at a time. (R. 252, 256.) He was still able to do minor housework, including cleaning, cooking meals, and caring for his dog, and had no trouble attending to his personal care. (R. 252–53.) He was able to go grocery shopping. (R. 254.) He reported that he could lift up to 30 pounds and could walk for about two blocks on flat ground. (R. 256.) He could not squat, kneel on his right knee, or bend at the knees, and he could walk up no more than two flights of stairs. (R. 256, 258.) In an updated report that he completed approximately five weeks after his January 2013 jaw replacement surgery, Kolaites related that the pain in his jaw was causing headaches. (R. 286.)

At his hearing on February 24, 2014, Kolaites testified that he had worked since he was 16 years old, predominantly at grocery stores. (R. 78–79.) He reinjured his

knee on October 26, 2010 when items from a pallet came loose and struck him in the head, causing him to twist and fall. (R. 51.) After that incident, he attempted to return to work three times in 2011 and 2012. (R. 51–52.) While working four hours a day per his doctor's orders, he experienced pain that slowed him down considerably after two and a half to three hours of work. (R. 55–56, 78–79.) He described his pain as "a bone on bone type of pain," as if "someone was driving a nail right into [his] kneecap." (R. 76, 78.) His attempts to return to work full time were unsuccessful. (R. 55–56.) After a full work day he awoke with a stiff knee and could do much less the following day. (R. 78.)

### D. Vocational Expert's Testimony

At the hearing, the Vocational Expert ("VE") described Kolaites's past jobs by their vocational characteristics. His most recent work was classified as manager of a retail store, a skilled position typically of light exertion, but performed by Kolaites at heavy exertion. (R. 80–81.) Prior to that, he performed light work as a driver on a sales route, a semi-skilled position normally performed at a medium level of exertion. (R. 81.) He also worked as a sales representative for water softening equipment, which is generally a light, skilled position, though, per the VE, Kolaites performed it at a medium exertion level. (R. 81.) Upon questioning from Kolaites's counsel, the VE testified that lifting requirements for a retail sales manager could vary depending on the weight of the boxes at that particular type of store. (R. 83.) However, the position would always require the worker to walk or stand for at least six hours a day. (*Id.*)

### DISCUSSION

## I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any other step precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one through four. *Id.* Once the claimant shows an inability to perform his past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

Here, the ALJ found at step one that Kolaites had not engaged in substantial gainful activity since his alleged onset date. (R. 32.) At step two, the ALJ concluded that Kolaites has severe impairments of status post surgery right knee secondary to right medial meniscal tear and patellofemoral arthrosis; and status post joint replacement, right TMJ. (R. 32.) The ALJ found at step three that the impairments, alone or in combination, do not meet or medically equal a Listing. (R. 33-37.) The ALJ

then determined that Kolaites retains the RFC to perform a full range of light work, which leaves him able to perform his past relevant work as a retail grocery store manager, sales route driver, and sales representative.  (R. 40.)  Therefore, the ALJ entered a finding of not disabled.  (R. 41.)

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error.  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, or resolving conflicts in evidence.  *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "reasonable minds could differ" as long as "the decision is adequately supported") (citation omitted).

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits."  *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).  In cases where the ALJ denies benefits to a claimant, he must "build an accurate and logical bridge from the evidence to his conclusion."  *Clifford*, 227 F.3d at 872.  The ALJ

must at least minimally articulate the "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . and must adequately articulate his analysis so that we can follow his reasoning . . . ."); *see Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence.").

## III. ANALYSIS

Kolaites poses two arguments in support of his request for remand: (1) that the ALJ improperly discounted his testimony; and (2) that the ALJ failed to provide a sound explanation for his weighing of the opinion evidence. The Court agrees that remand is appropriate on both grounds.

### A. Analysis of Medical Opinion Evidence

In evaluating a claim of disability, an ALJ "must consider all medical opinions in the record." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013); *see* 20 C.F.R. § 404.1527(b). The opinion of a treating physician is afforded controlling weight if it is

both "well-supported" by clinical and diagnostic evidence and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Because of a treating doctor's "greater familiarity with the claimant's condition and circumstances," *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003), an ALJ must "offer 'good reasons' for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also See Stage v. Colvin,* 812 F.3d 1121, 1126 (7th Cir. 2016). Those reasons must be "supported by substantial evidence in the record; a contrary opinion of a non-examining source does not, by itself, suffice." *Campbell,* 627 F.3d at 306.

Where the opinions of different physicians diverge, the ALJ must weigh each opinion by considering such factors as "the length, nature, extent of the treatment relationship; frequency of examination; [each] physician's specialty, the type of tests performed, and the consistency and supportability of [each] opinion." *Scott*, 647 F.3d at 740; *Books v. Chater,* 91 F.3d 972 (1996). The ALJ must then provide a "sound explanation" for that decision. *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011).

After each evaluation, Kolaites's treating orthopedic surgeon, Dr. Szuch, provided updated opinions for Kolaites's employer about his ability to work. (R. 487, 517, 568, 595, 598, 681.) From March 2011 onward, Dr. Szuch consistently recommended that Kolaites stand or work for no more than four hours per day. (*Id.*) On August 31, 2011, she released him to work with permanent restrictions to 45 and 35-pound weight limits, no right side kneeling, and only short periods of crouching, specifying that he could not work if such modified duty was unavailable. (R. 583, 687.)

On September 30, 2011, Dr. Szuch clarified those work restrictions, reiterating that "all physical work can only be done for up to 4-hour shifts per day. If he is given sedentary work, that could be performed without restriction in regard to work hours." (R. 585.)

The ALJ gave Dr. Szuch's September 2011 opinion "some weight," but declined to afford it controlling weight. He explained, "evidence received at the hearing level showed the claimant was more limited in some areas than the orthopedic specialist had indicated." (R. 19.) This reasoning certainly serves to explain why the ALJ's RFC assessment finds Kolaites capable of lifting less weight than Dr. Szuch recommends.[1] However, the ALJ's assertion that Kolaites is "more limited in some areas" does not explain the ALJ's ultimate assessment of an RFC *less* limited than that asserted by Dr. Szuch with respect to sit/stand and postural requirements. The ALJ found Kolaites capable of standing and walking for up to six hours per day, which is a greater allowance than the four-hour limit repeatedly articulated by Dr. Szuch. Additionally, the ALJ imposed no postural requirements, despite Dr. Szuch's opinion that Kolaites cannot kneel at all and can crouch only for "short periods." We are left wondering why the ALJ chose to reject these findings.

In lieu of any direct explanation for rejecting the postural and standing limitations imposed by Dr. Szuch, the ALJ simply stated that "it was not known" whether Dr. Szuch's understanding of the terms like occasional, frequent, and sedentary "reflected the definitions used by the [Social Security] Administration." (R. 40.) This argument is exceptionally weak given that Dr. Szuch's opinion does not contain any difficult-to-understand jargon. Indeed, she consistently ordered her patient to observe a specific

---

[1] The ALJ found Kolaites capable of "light work," which restricts lifting to 20 pounds occasionally and 10 pounds frequently. (R. 16); *see* 20 C.F.R. § 404.1567(b) (defining light work).

time limit for "physical" activity—four hours—contrasting that recommendation with "sedentary" activity.  Whether or not Dr. Szuch was well-versed in Social Security regulations, the plain meaning of her recommendation is clear enough that the ALJ should have, at a minimum, addressed it directly.  Dr. Szuch also indicated that Kolaites should not kneel on his right knee and should crouch for only brief periods; these directives, too, the ALJ ignored.  Instead, he found Kolaites capable of standing or walking for up to six hours a day with no restrictions on kneeling or crouching.  In the face of his assertion that Kolaites was "more restricted" than Dr. Szuch had found, his RFC finding is puzzling.  Therefore, this matter must be remanded for the ALJ to clarify how he addressed each of Dr. Szuch's recommendations.

Moreover, even where an ALJ properly declines to give controlling weight to a treating physician's opinion, he must explain the weight given to it and other available medical opinions in accordance with the regulatory factors.  The ALJ identified Dr. Szuch as an orthopedic specialist and acknowledged that she is a treating physician, but he did not explain how he accounted for "the length, nature, extent of the treatment relationship" and the "frequency of examination" in rejecting many of the limitations she imposed.  Dr. Szuch examined Kolaites at least eight times in the first eight months of 2011 and performed his arthroscopic surgery in February.  (R. 424, 429–30, 568, 681, 583, 687.)  She examined him again after his February 2012 re-injury, after Kolaites had returned to working full time, and noted that his new injury arose from doing work in excess of his tolerances.  (R. 598.)

Because the ALJ's assessment of Kolaites's residual functional capacity for light work was based in large part on his decision to reject several of the limitations imposed

by Dr. Szuch, his failure to provide a "sound explanation" for that choice is an error that mandates remand. *Punzio,* 630 F.3d at 710.

**B.      Subjective Symptom Evaluation**

Kolaites also criticizes the ALJ for discrediting his testimony regarding his physical limitations. As an initial matter, the Court notes that the Social Security Administration has recently updated its guidance about evaluating symptom severity in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the SSA's sub-regulatory policies to "more closely follow [the] regulatory language regarding symptom evaluation" and to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where, as here, the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482–483 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999); *see also Hernandez v. Colvin,* 2016 WL 4681227 (N.D. Ill. Sept. 7, 2016). Therefore, it is appropriate to evaluate Kolaites's credibility argument in the context of the guidance the Administration has provided in SSR 16-3p.

As before, under SSR 16-3p the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities. SSR 16-3p, 2016 WL 1119029 at *2. The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-

disability while ignoring evidence that points to a disability finding. *Goble v. Astrue,* 385 Fed. Appx. 588, 593 (7th Cir. 3010.) However, the ALJ need not mention every piece of evidence so long as he builds an accurate and logical bridge from the evidence to her conclusion. *Id.* In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995.)

Rather, SSR 16-3p requires the ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029 at *7. We will only reverse the ALJ's credibility finding if it is "patently wrong," meaning that it lacks "any explanation or support." *Elder*, 529 F.3d at 413-14.

Here, the ALJ's negative assessment of Kolaites's credibility rested in part on mischaracterizations and omissions of evidence and he placed undue reliance on Kolaites's limited daily activities. On remand, the ALJ should rectify these errors.

First, the ALJ mischaracterized Kolaites's testimony as implying that "use of his right knee was limited because of pain caused by 'bone on bone' contact," then went on to attack that statement as contradicted by the objective medical evidence. (R. 17–18.) But Kolaites never said his pain was caused by actual bone on bone contact. When he

said, "I would describe it as a bone-on-bone type of pain" and "a sharp pain, almost like…like someone was driving a nail right into my kneecap," he was describing the character and intensity of his pain.  (R. 77–78.)  Those subjective descriptions are not discredited by the absence of actual bone-on-bone contact, or the absence of a nail for that matter, in his X-ray and MRI scans.

Second, the ALJ thought Kolaites's testimony was inconsistent with his ability to "drive, cook, and use a vacuum cleaner," to "care for the family dog without help," to perform some housecleaning, and to go grocery shopping unaided.  When considering a claimant's daily activities in assessing credibility, an ALJ must explain the perceived inconsistencies between the claimant's daily activities and the medical evidence.  *See Carradine v. Barnhart,* 360 F.3d 751 (7th Cir. 2004); *Zurawski*, 245 F.3d at 887. Additionally, the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."  *Roddy*, 705 F.3d at 639.

Kolaites does not contend that he is entirely immobile or unable to engage in brief activities.  He does contend that long periods of activity cause him disabling pain in his knee.  The daily activities he reports are fairly restricted: his "care for the family dog," for instance, consists of feeding her and opening the door to let her outside.  (R. 187.) The light housekeeping and simple errands that Kolaites acknowledges he is able to perform do not undermine his claims that his has difficulty twisting, kneeling, climbing stairs, and standing or walking for extended periods.

The ALJ's third reason for discrediting Kolaites's testimony about his pain is that "if the pain he experienced was as bad as described it would interfere with his ability to

concentrate," which is contrary to evidence that he could concentrate enough to read and watch television.  (R. 18.)  Again, the ALJ has failed to identify any genuine inconsistency.  Kolaites's admitted ability to concentrate while reading a book or watching television, both sedentary activities, does not undermine his testimony and his reports to his doctors that his knee stiffens and causes him pain after periods of use.

As a final reason for rejecting Kolaites's claims of disabling pain, the ALJ wrote, "A finding of 'disabled' requires more than finding an individual is unable to work without pain," and went on to cite law stating that the pain must flow from a medically-determinable impairment that could reasonably be expected to produce the symptoms. (R. 17.) There are two problems with the ALJ's logic here.  First, the ALJ's opinion establishes that Kolaites *does* have a medically-determinable impairment in his right knee, which the ALJ termed "status post surgery…secondary to right medial meniscal tear and patellofemoral arthrosis."  (R. 11.)  The ALJ also acknowledged that "It is reasonable to assume that after two operations on his right knee, [Kolaites] would have some limitations."  (R. 19.)  Therefore, his credibility assessment must move beyond the step of establishing a medically-determinable impairment that could cause Kolaites's pain, to the second stop of evaluating the intensity and persistence of that pain.  And at this step, an individual's own statements about his pain "may not be disregarded solely because they are not substantiated by objective medical evidence."  *Hall v. Colvin,* 778 F.3d 688, 691 (7th Cir. 2015); *Pierce v. Colvin,* 739 F.3d 1046, 1049–50 (7th Cir. 2014).

Further, the ALJ's assumption that Kolaites could work with his level of pain ignores his history as detailed in the medical record.  His orthopedic surgeon, who worked at the clinic recommended by Kolaites's employer, repeatedly directed him not

to walk for extended periods or do physical work for more than four hours a day. (R. 589, 592, 598.) And indeed, when he returned to work, he reported that his knee pain was slowing him down. (R. 55–56, 78–79, 516–517.) In his third day back on the job full-time in March 2012, Kolaites fell and reinjured his knee. (R. 598.) Kolaites's testimony about his failed work attempts and about his physical limitations thus finds considerable support in the medical record. All of these shortcomings warrant remand and the ALJ should take care to properly assess Kolaites subjective symptoms on remand.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED. The Court remands this matter to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

_____
**Michael T. Mason**
**United States Magistrate Judge**


**Dated: January 4, 2017**